Case number 24-1223, Tiara Yachts Inc v. Blue Cross Blue Shield of Michigan, oral argument not to exceed 15 minutes per side. Aaron Phelps for the appellant, you may proceed. Okay, thank you your honor, may it please the court. Tiara Yachts is a West Michigan boat manufacturing company that at the time was questioned had employed around 600 people. It provided health care benefits to its employees through a self-funded ERISA-governed plan. In order to administer that plan, it retained the service of Blue Cross Blue Shield of Michigan to serve as the claims administrator or the claims processor and make decisions relative to that plan, to pay claims. As part of that process and consistent with the contract, provided Blue Cross Blue Shield with millions of dollars to pay those claims and provided that money in advance. That money went to Blue Cross to a Blue Cross owned and controlled bank account. Do you think, I was curious why you think it should be considered planned assets? It's not really an issue in this case, but I suppose it is because you think that the overcharges belong to the plan rather than to the company. Why would the company take that? That seems systematically against your interests because the overcharge, you can't use it for general expenses. So even though it was company money, once you send it to pay a bill, if you accidentally, if you say the check was accidentally with an extra zero, you can't get a refund. It's automatic. It becomes the plan's funds at that point. At that point in time, it became planned assets. Some state might be paying, but for certain, when that money went there, they owned, they controlled plan assets. Those are planned assets. That's a holding of Hilex. That's the way that money works. That's what it is. If it's not planned assets, then what does Blue Cross have control of and what are they using to pay health care claims? So I don't believe that's in dispute, but those are planned assets. That is our position. And yes, any recovery would be on behalf of the plan. And that money would have to be used for planned purposes. So that is the intent. That is our intent. That is T.R. Yacht's intent and sponsor. And that is what we're asking for ultimately. But so I guess you would concede then if there's a mistake made in the amount of money you send to the bank account, that it becomes the plans? It would be planned. That's basically what your allegations are, that they're overpayments. I do believe there is a way to establish that if all plan obligations are met, so a company goes out of business, let's say things are shut down. When all plan obligations are made, there is a provision that allows a version of that money back to the plan sponsor. But there's a process for that. So to answer your question, I think you could get the money back through a process that's regulated by the Department of Labor. But for purposes of this case, we're only seeking money back on behalf of the plan maker. And that would seem to be pretty usual for self-funded plans, that you'd need to just kind of have a separate account or something like that to kind of distinguish between the general company's assets and what is being kind of designated over for the health care costs. And that is the way Blue Cross Michigan handles all of these self-funded arrangements. The money goes to their account. They then have control over it. We have no control over that. That is to be protected, the ERISA regulations, and it is to be used only to pay land expenses. And because they had control of that money, they became an ERISA fiduciary at that point in time, period. They are also an ERISA fiduciary because they had discretion and authority in the administration of the plan. They are the ones that make the decisions when the claims come in from buyers. They decide whether that is a covered claim, whether it should be paid, at what amount it should be paid, whether the procedures of the plan have been followed as far as pre-authorization and et cetera. And when they exercise that level of discretion, that is also a fiduciary function. Do you think they're acting as a fiduciary when they negotiate the rates with your client? With my client, no. So, when they negotiate the administrative contract. So, why wouldn't your theory suggest that you could switch any contract term into a fiduciary breach? So, if you think they extracted too high of a price in the contract, say price per claim or something, just say that they breached their fiduciary duty when paying a claim because they took too high of a price. They, there are provisions in ERISA where they cannot receive more than reasonable compensation. So, if it were unreasonable compensation, that could be challenged. We're not challenging the amount they charge to administer the plan as unreasonable. We're not challenging what we pay them as an administrative fee. That's negotiating. But why, that's, but you are challenging the 30 percent recovery fee, which strikes me as just part of the price. So, so you, there may be this systematic across plan issue. But even if you take a functional approach, paying an individual claim might involve fiduciary status because you're exercising control of the funds. But it's not obvious to me that adopting this 30 percent savings plan is exercising a fiduciary capacity in any way, because I would view that function as more analogous to just negotiating the price than to actually paying a claim by exercising control over the funds. The issue with savings, shared savings program is the 30 percent is in the contract, but it's 30 percent of what is a piece of a formula. The 30 percent of what is the savings? What are the savings? The savings is what is identified in a second pass review by Blue Cross or its vendors. So in every claim, there's a first pass review. So Blue Cross is exercising its fiduciary obligations. They're reviewing claims. They're approving claims. Once those claims are approved, they may be subject to this shared savings program, which is a second pass. The problem is they've created a conflict of interest because they get 30 percent of all the savings. So they want to find as many mistakes as they can. They have control on the front end as to how many mistakes might be made. It is a clear conflict of interest where the more mistakes they make, the worse they do at administering claims during the first pass, the more mistakes there are. If the mistake at the on this allegation, because you would be entitled to the full amount of the money that was mistakenly privileged, I guess, dispersed at first pass. I think if you would be entitled to the 100 percent back, not the 70 percent. If you assume that every mistake they make is a breach of fiduciary duty, this could be two theories of recovery. I'm sure Blue Cross would tell you that just because a mistake is made doesn't necessarily mean it was a breach of fiduciary duty. So we would still say it was a breach of fiduciary duty. The main theory of the breach seems to be this flip logic, right? But presumably the savings plan that 30 percent could catch mistakes that are not due to to flip logic. We think that they, and we're talking about millions of dollars worth of claims for 600 people over multiple years, any claim that they approve could be subject to the second pass review. And if they find any for any mistake or for any other reason that they deny the claim at the second pass, they're going to take 30 percent. And I understand 30 percent of the contractual provision, but this is an ERISA case and we can't have a situation where a planned fiduciary has set up a conflict of interest where they benefit and they have discretionary control over how much they get paid. They pay themselves out of those planned assets. That's how this works. That money gets wired to them. They determine whether the savings are. They determine how much they're going to get paid. All of that is done unilaterally by Blue Cross in its discretion. We don't write a check for that. They take that money out of the planned assets. So we have a situation where a fiduciary is paying itself and it's paying itself an amount of money. So is it your point of view that so if you are correct and their response is just to do away with the second level review, aren't you worse off? So instead of getting 70 percent back of the second level recovery, you get zero back. We don't want to pay in place to do the job. No, so if the first step is a breach, you get 100 percent back. I think the only way you're entitled to recovery on the savings plan is the assumption that the first step is fine. That there was a mistake but it wasn't negligibly done. And this is just a belt and suspenders approach to help people. And you're saying that this itself is a breach. I don't understand why their response is just not going to be to do away with it. You get nothing back. They've already taken the money. So going forward, maybe they will do away with it. I don't know. So is there any theory where this second level review under your view is possible? So that seems quite traumatic. Why is this in your interest? There's this if they charge a dollar amount that was agreed to with the contract. If they said we're going to do a second fast review and it's going to be two dollars per employee per month, that is an agreed known amount of money negotiated in an arm's length transaction. And there's no discretion there. It's two dollars or one dollar, whatever it is. Well, there's the same discretion you have that which ones they find to review. Isn't your theory of discretion is that it incentivizes them to make mistakes on the front end? Does your theory about the fiduciary status for the SSP program depend on whether it's money that's already been paid out to providers that then they're trying to claw back that was an overpayment versus mistakes they're catching before a bill is ever paid to providers? Well, that's a great point. If they catch the mistake, then it never cost us any before the money goes out. Then they've now taken 30 percent. So I guess that is an answer to your question about, is it a double payment? I was assuming the money was paid out. That's a breach of fiduciary duty. We get the money back and then this is a second theory to get it. But it also happens that they catch mistakes before they're made. So they didn't necessarily breach their fiduciary duty. They were on their way to doing so. They caught it the second time. But now we've paid the 30 percent for them to fix their first mistake. And how many of these mistakes could have been avoided if they weren't incentivized to making more money? The reality of the program is, the more mistakes they make on the front end, the more they are to catch on the back end. And it's a percentage. So the more money they, fees they can collect, that's just the way it works. And that runs afoul of ERISA. We say pipefitters highlights similar fee cases where they've retained, school across Michigan retained discretion relative to the collection of these. Okay. Thank you, counsel. All right. We'll hear from Mrs. Flint. Your honors, may it please the court. Casey Flint on behalf of Blue Cross Blue Shield of Michigan. Let me start with shared savings. So the theory, as I understand it, is that shared savings is a prohibited transaction, a breach of fiduciary duty, because Blue Cross supposedly has discretion in how much it's going to pay itself. As the court has already recognized, of course, it doesn't have discretion as to the percentage. That's fixed in the contract. Right. So the only possible theory is that Blue Cross somehow has discretion because it overpays at the front end. On the facts of this case and also the law from other circuits, that claim doesn't work. So let me talk about the facts first. Blue Cross does not control the amounts that it applies this 30% rate to. They're specified in the contract, which is attached to our motion to dismiss what amounts the 30% is applied to. It controls what claims are paid in the first instance and how much they're paid for. It has discretion. First pass. Right. Payments. But the amount that the 30% is applied to is amounts that are actually recovered or costs that are actually saved through the work of third-party vendors that are outside. But it's a percent, right? So it's going to change based on the amount of the claim. So if you save a certain amount and then you get 30% of it, that first amount on the first pass is something that you have discretion over. We have discretion over payment of claims. But even if you accept the premise that Blue Cross wanted to increase the pot of money that could potentially be recovered and have the 30% applied to, that still doesn't amount to control of the amount that it is applied to. Someone has to submit a charge to Blue Cross that is excessive. Then Blue Cross has to pay that charge. Then that charge has to be recovered through the work of third-party vendors. Or caught beforehand. Hospital claims can be pre-recovered. That's right. Both the First Circuit and the Eighth have addressed very similar claims about cost savings, where the same theory was advanced, that this incentive theory, that A, parties working to control costs are incentivized to try to control too much stuff or mispay at the front end. Or in one case, it was about people, companies that identified claims that should be challenged, identifying more claims that should be challenged. Because these people are incentivized, the theory was to identify more claims or overpay more times and then retain a fixed percentage at the back end. The Eighth Circuit in multi-ag and the First Circuit in mass laborers, they both rejected that theory because there are too many steps outside the control of the entities between the payments or challenges at the front end and the recovery at the back end. Does it matter? So I thought mass, the First Circuit case, was pretty well distinguishable, at least on the, whether the entity is a fiduciary point, because they didn't have control over the funds, like they couldn't write checks like Blue Cross Blue Shield could here. So I don't know, but does that matter for purposes of this point you're making now? No, it doesn't. That is true. So in that case, the Blue Cross entity and mass laborers, those claims were ultimately approved by the customer before they were paid. But the reason why the shared savings program wasn't a problem wasn't because, I mean, the reason why they rejected the shared savings type claim wasn't because of the customer acceptance per se. It was because of the overall absence of control, because there were too many steps between the initial payment and the recovery. Beyond that fiduciary issue. How the statute is worded, so just kind of to go back to the kind of original text about the fiduciary duty, there seem to be two parts, or at least two parts, right? One is any control over the plain assets, and then the second one is kind of discretion over administration, right? So if we're talking about any control over plain assets, which seems kind of broad, the word any, right, that money that you haven't yet paid out to provider, right, that sits still with the plan, and then you're awarding yourself 30 percent of whatever savings on a claim, is that exercising any control over plain assets? Not according to this court in Seaway. So the court in Seaway said, once the says this pot of money, this fixed amount, 30 percent of these specified categories is retained for compensation, it's not plain assets anymore. There's no fiduciary act in retaining that amount. I mean, plain assets, as your Honor Judge Murphy was talking about at the beginning, it's kind of a functional concept. You know, funds held in trust, and once the parties agree that funds are going to be used, a fixed amount of funds, 30 percent of specified pots of money, are going to be used as compensation. That's not control of plain assets according to this court in Seaway. Another thing I'd like to raise about shared savings beyond the fiduciary status point is the theory here is clearly a theory about fraud. I mean, this concept is that we sit there, you know, twirling our mustache and paying out claims at the front end because we know we're going to get this money at the back end. I think there was even talk about double recovery or something during the first part of the argument. You know, that's like kidnapping your neighbor's cat and saying, I found it, I get the reward. I mean, that is deception. The complaint talks about deception and misleading acts in the context of shared savings. So that is a fraud claim. And accordingly, it's subject to Rule 9B. And Judge Yonker- Have you ever subjected any kind of self-dealings claim to 9B? Is there a good analogy? Well- Or ERISA, like self-dealing claims where we've applied heightened scrutiny to the pleading? The court in Cataldo did talk about the application of Rule 9B in the context of an ERISA claim, it was talking about the fraud and concealment statute of limitations point. Right. Not kind of a traditional self-dealing claim like here. I mean, I don't know that we have like, obviously, like the SSP is not concealed, right? As you're telling me, like it's in a contract, we've agreed to it, like all this stuff. It's hard to say, you know- Amounts are reported on a regular basis. Right. So it's, you know, I don't know that like concealment, like we usually, you know, to go back to your cat example, you know, you're like, you know, hiding that you, you know, stole your neighbor's cat. I mean, here seems to be something that's out in the open. And the allegation seems to be self-dealing, like the worse you do on pass one, the more you get on pass two. And because of the kind of nature of a fiduciary obligation, we don't allow that. The complaint that we have in front of us is a complaint about a fraudulent scheme. The complaint about intentionally overpaying, not sort of loose incentives that could apply adverse incentives. And I would suggest that incentives concept that you were just discussing, Judge Bloomcats, is this exactly the one that is rejected as a basis for fiduciary liability in mass laborers and multi-ag. I mean, that's exactly the theory that the court says doesn't hold up to establish a prohibited transaction in both of those cases. But you wouldn't have to prove 9b for that theory though, right? Because the theory is just, it's automatically, I think your friend on the other side just told me that he didn't think this is the type of an arrangement that can exist if ERISA applies. And I don't know that that necessarily depends on fraud, that broader theory. That may be right. If the court adopted that broad theory, it would be in conflict with the First Circuit and the Eighth Circuit, which have rejected the broad form of that theory. I think the factual story that is pled in this complaint is one of a fraudulent scheme. Maybe it's possible to plead a claim like this that isn't a fraudulent scheme, but the one they have pled is a fraud scheme to which I would submit 9b applies. I haven't found a lot of case law, like the Codaldo case was really about fraudulent concealment. And so you had to prove the elements of fraud. This is kind of a breach of a fiduciary duty through misleading statements. You think 9b should apply, like when should kind of stray statements about misleading statements, when should that be enough to trigger Rule 9b? In a complaint. In a complaint, when the claim itself is not like a traditional fraud claim. It could be like, you know, breach of a fiduciary duty. It can be all sorts of things that have nothing to do with fraud. But maybe if you allege fraud as the basis of your theory, it can trigger 9b. But when do you think, what allegations, you think you should have to prove the traditional elements of fraud, you know, materiality, reliance, and that sort of thing to trigger 9b? Or do you think just a statement about how your client engaged in deception is enough to trigger 9b? I think a statement about engaging in deception in order to, you know, I guess in the words, in the paraphrasing the complaint, in order to steal their money by, you know, sending out their money so that we can recover more on the back end. Intentionally. I mean, what they claim that this is knowing that we, not just that we're looser because of, you know, bad incentives, but that we knowingly paid out improper claims with the motivation of recovering it at the back end. I think that level of intent, deception, and misleading conduct gets you to a Rule 9b application. To talk about the flip logic theory a bit as well. So, I mean, the case that I think really answers this question is DeLuca. So, DeLuca, as I'm sure the court is aware, distinguishes between allegations as to how a system functions versus allegations as to how the administrator worked with respect to a particular plan. And that distinction comes out of the statutory definition of fiduciary, which requires actions with respect to a plan. And I direct the court to Judge Kethledge's separate opinion in DeLuca, which I think is very helpful here. So, he dissented, but he explained, look, if what Blue Cross was doing is developing an off-the-shelf product, then that's pretty easy. That's not a fiduciary act. If you're selling an off-the-shelf product, in that case, they were talking about provider networks with associated rates, then that's not a fiduciary act. He dissented because he thought the record in that case wasn't clear enough to show as a matter of law that it was an off-the-shelf product type of situation. He thought it was possible that Blue Cross could have negotiated different rates for a particular plan. I mean, DeLuca talks in terms of capacity, right? That Blue Cross Blue Shield of Michigan, right? It was also Michigan and DeLuca, right? Had multiple capacities. So, one was as a claims processor, and there wasn't really a dispute in DeLuca about what it was doing, you know, if it was doing something in processing like an individual claim for a plan, that that would give rise to a fiduciary relationship, right? And then it talked about this second relationship, right? A second capacity as a distributor of healthcare services, right? Negotiating rates with all the different providers. In this case, how do you say you're not just like doing the claims processing here? I mean, it's every single claim that you're paying out for periods, right? That uses flip logic. It's just part and parcel with the claims processing. I think the problem here with the claim is the way the complaint is written. And I want to be clear that it's really about this complaint. It's not like a, you know, novel principle of ERISA law. So, this complaint is written to talk about the flip logic system. This is like a software system that was developed well before Tieriat's came along. The complaint alleges 1997, they introduced flip logic. Tieriat's didn't come to Blue Cross until 2006. So, nearly a decade before. Obviously, no one would suggest or conclude that when Blue Cross developed the flip logic system in 1997, it was taking an action with respect to Tieriat's plan, obviously. So, but when the allegations focus on the system, that is the world we're in. We're in the DeLuca world. So, Blue Cross Blue Shield could just have a system that overpays or maybe somehow deprives plans of so many assets for all of the plans that it manages. If making a system-wide decision, it's not... Making a system-wide decision doesn't protect Blue Cross. I'm not saying that that, you know, is some kind of immunity. The issue is what does the complaint say? So, in a world where a system is, I think you were starting to say, you know, overpaying everyone's claims 100% of the time or whatever, you know, the worst system ever that squanders every plan's assets. Of course, any plan that could, you know, come into court and allege, here's what they did with respect to my plan. Here's why it breached their fiduciary duty to me. But doesn't this complaint say it applied to all non-auto plans and Tieriat's is a non-auto plan? The complaint is 100% about the system and how it affected... Isn't that... I share Judge Blumkatz's instinct that it should be about function rather than generality. So, I would distinguish DeLuca on the idea that paying providers is different than processing claims. Negotiating providers. So, I think the point you're responding with is almost a bumbling that it's less about... It may well be a breach as applied or it may well be a breach if you have an incompetent system that you haven't adequately alleged that it's applied to you. They haven't alleged facts about anything Blue Cross did with respect to their plan, which is just the ticket... I'm just trying to keep it clear in my head. That's less about a risk capacity idea. The system as applied to them could well raise a breach, but it's more about the fact that they just didn't allege a specific application to them. So, they haven't satisfied kind of plausibility pleading standards or whatever you want to call it in your case. We don't have any idea if they've ever had it applied to them. I think it's both, Judge Murphy. I think DeLuca tells us the difference between system and individual plan. And as your question earlier, Judge Blumkatz indicated, you know, if some plan could come forward and say this system caused them to breach their fiduciary duty when they were acting with respect to my plan and here are my facts, that might be a breach of fiduciary duty claim. What you can't do is come into court and this is a terrible system. I'm in the system and this system affects me. And I mean, this is really a unique complaint in the way it is written to do that. I would point the court to, I mean, trust the court, of course, will review the complaint carefully as Judge Yonker did, but I would point the court in particular to paragraph 46, which summarizes their theory that the platform was problematic and impacted customers, including Teareots. That's really almost exactly the language of DeLuca that, in that case, Blue Cross was alleged to have, you know, made errors and then that impacted the plan. Then I'd point the court again to the first paragraph 108. There are two paragraph 108s in the complaint. This is the one on page 16, page ID 16, where they essentially come right out and say this is a bad system. It impacted customers, including Teareots. We don't have anything to say about our own plan, but we hope we will after discovery. That's how I read that paragraph. Thank you very much, your honors. Thank you, your honor. I'll start with DeLuca because DeLuca says, quote, as the administrator and claims processing agent for the plan, the parties do not dispute that Blue Cross Michigan acted as a fiduciary in that capacity. That is the capacity in which both sets of our claims, they overpaid claims. That was part of their function as a claims administrator and a claims processor. And they took fees for themselves out of plan assets, which was a problem because they controlled the front end process as the claims processor, which influences the amount of fees they get on the back end. As to the discussion about the pleading and the flip logic, I want to highlight because it's not mentioned anywhere in the court's opinion that there were multiple exhibits attached to our complaint that included internal Blue Cross Blue Shield emails about this flip logic. And in those emails, Blue Cross said, quote, it is observing abusive provider practices, close quote. And it says by quote, by allowing reimbursement at charge providers bill and get fully reimbursed for highly inflated cost of services, close quote. That's how Blue Cross describes the flip logic problem. Blue Cross also believed it had a responsibility to our ASC customers, close quote. That is a director of Blue Cross Blue Shield of Michigan in an internal email describing the very subject matter of this complaint. Our lack, quote, our lack of control over the issue was viewed as a failure to fulfill this responsibility. That's how they viewed it before this lawsuit when they were talking among themselves. And as to the allegation that the district court found that we hadn't alleged that we were impacted, and I hear threads of that in argument today, this internal email says, quote, who's impacted? Question mark. And according to Blue Cross, quote, all customer groups on NASCO Classic with exception of auto. That is to say we have not pled a plausible breach of fiduciary duty claim when we have literally attached the evidence that in my mind ought to survive summary judgment with admissions. It makes absolutely no sense and it is not discussed anywhere in the complaint. Excuse me, anywhere in the opinion. What do you make of the fraud theory? So you do clearly have allegations in your complaint that Blue Cross engaged in misleading and deceiving paragods by implementing a shared savings program. And so I'm curious, why would you put those fraud-esque allegations in the complaint if you don't think you need to rely on fraud? We don't, we're not accusing them of fraud. We don't have a fraud count. We, you can do two things. They can be knowingly doing things that are wrong and the shared know about it. It violates ERISA. The question of, they're bad acts. I mean, they knowingly entered into this plan where they knew they would control the inputs which would result in more fees for them on the back end. They don't disclose how they came about that. So that is a fact. They don't give us a detailed report on that. So is there some level of deception? Yes. Does that make this a fraud account? No. But regardless. Would you concede though, setting aside whether this complaint does it, just in the abstract, Rule 9b can apply more than just to formal fraud claims. If your breach of fiduciary duty claim was actually, essentially they breached their duty because they committed fraud against us. Yes, you could have. Certainly you can have Rule 9b apply to more than just a common law fraud claim. I could see that. But I want to emphasize that we have pled everything that is necessary to establish the claim. The claim is prohibited transaction. The claim is breach of fiduciary duty. We all understand how the program works. They understand how the program works. Even if 9b applied, what is the mystery of what's going on? What else would I say that isn't clear to establish the claim? So in the 9b cases, we have tons of false claims that cases where we say you have to identify a specific claim. And I don't think you've identified a specific claim. We have not identified a specific claim. They have control over the claims data. There's no way for us to do that. That's why I think it actually is could make a difference for what it's worth. So our Rule 9b cases suggest you have to both plead a theory, a general theory of fraud, which perhaps you have done. But you also have to identify a specific claim to go along with that theory. Here's what I would say. The allegations of deception or wrongdoing are not elements of the claims. There's no reason. There's no logical connection between dismissing a breach of fiduciary duty claim. The question ought to be, have you pled the elements of the claim? We've pled the elements of breach fiduciary. We've pled the elements of a prohibited transaction claim. An element is not deception. So to say you're accusing us of deception, fine. But that's not an, I don't need to even prove that. So maybe I'm just wrong. Maybe it's not deception. It's not an essential element of the claim. So that would be no basis to dismiss it, to say, well, you haven't pled something that you don't even need to plead in the first place. So it needs to be a claim where fraud or fraud-esque behavior is an element. And then, of course, the question, well, have you pled it with sufficient specificity to meet Rule 9b? But if it isn't an element, it's just extra words in the complaint. And maybe it'd be more helpful if it wasn't there. Okay. Thank you. Thank you. Thank you, counselors. The case will be submitted. The clerk may call the next case.